# EXHIBIT A

EXECUTION VERSION
CONFIDENTIAL

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of April 25, 2018, between Seabrella LLC, a Florida limited liability company ("Buyer"), Flamaggio LLC, a Wyoming limited liability company ("Company"), Berenika Maciejewicz ("Owner"). The Company and the Owner are referred to herein, each as a "Seller" and collectively, as the "Sellers."

**WHEREAS**, the Company is, among other things, in the business of marketing, distributing and selling art and office supplies and similar products through United States and international websites including Amazon.com, ZenZoi.com under the name "ZenZoi" and otherwise (the "Business") and owns certain tangible and intangible assets associated therewith;

**WHEREAS**, the Company owns and controls all of the Purchased Assets, and in consideration of the direct and indirect benefits accruing to Owner, and to induce Buyer to enter into this Agreement, Owner has agreed to be party to, and to make certain representations and warranties and agree to certain covenants as set forth in, this Agreement;

**WHEREAS**, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to acquire from the Company, and the Company desire to transfer to Buyer, substantially all of the assets and properties related to the Business.

**NOW, THEREFORE,** in consideration of the mutual benefits to be derived and the representations and warranties, conditions and promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

(a)     "Affiliate" means (a) with respect to any Person other than an individual, (i) any Persons that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or (ii) any director, officer, shareholder, member, manager, partner, trustee, trust grantor, trust beneficiary or other direct or indirect owner of such Person and (b) with respect to any individual, any member of such individual's immediate family or lineal ancestors or descendants or any Person controlled by or for any such individuals or in which any such individuals own or control more than one percent of any class of outstanding equity interests.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(b)     "Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or any similar combined, consolidated or unitary group defined under state, local or foreign income or other Tax law).

(c)     "Business Systems" means all software, computer hardware (whether general or special purpose), electronic data processing, information, record keeping, communications, telecommunications, networks, interfaces, platforms, servers, peripherals, and computer systems, including any outsourced systems and processes that are owned or used by or for the Company in the conduct of the Business.

(d)     "Claims" means the written notice from a party to any other party hereto, describing in reasonable detail the nature of any claim made against any Indemnifying Party (as defined in Section 6.2(c) below) pursuant to this Agreement and the amount of the Loss (as defined in Section 6.2(a) below) with respect thereto, if then known.

(e)     "Code" means the Internal Revenue Code of 1986, as amended.

(f)     "Contracts" means any contracts, agreements and commitments, whether oral or written.

(g)     "Data Security Requirements" means, collectively, all of the following to the extent relating to Data Treatment or otherwise relating to privacy, security, or security breach notification requirements and applicable to the Company, to the conduct of the Business, or to any of the Business Systems or any data: (i) the Company's own rules, policies, and procedures; (ii) all applicable laws, rules and regulations; (iii) industry standards applicable to the industry in which the Business operates (including, if applicable, the Payment Card Industry Data Security Standard (PCI DSS)); and (iv) Contracts into which the Company has entered or by which it is otherwise bound.

(h)     "Data Treatment" means the access, collection, use, processing, storage, sharing, distribution, transfer, disclosure, security, destruction, or disposal of any personal, sensitive, or confidential information or data (whether in electronic or any other form or medium).

(i)     "Excluded Taxes" means (i) any and all Taxes of the Sellers, (ii) any and all Taxes imposed with respect to the Purchased Assets, the Assumed Liabilities or the Business for any Pre-Closing Tax Period, (iii) any liability of Sellers for income Tax arising in connection with the consummation of the transactions contemplated under this Agreement, (iv) any and all liability of the Sellers for the unpaid Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract or otherwise, which Taxes relate to an event or transaction occurring before the Closing, (v) any value added tax (or similar tax) due by Company or Owner in any European or any other country or jurisdiction and (vi) Transfer Taxes.

(j)     "GAAP" means United States generally accepted accounting principles.

(k)     "Governmental Authority" means any legislative, administrative or regulatory authority, agency, board, subdivision, instrumentality or commission or other governmental or quasi-governmental entity, including courts and tribunals of competent jurisdiction, whether domestic or foreign, and whether federal, state, county, city or local.

(l)     "Indebtedness" means, collectively, all obligations or Liabilities arising out of transactions entered into at or prior to the Closing (as defined in Section 2.6), or any state of

2

facts existing at or prior to the Closing, including (i) Taxes with respect to the Purchased Assets, the Assumed Liabilities, the Business with respect to Pre-Closing Tax Periods and (ii) Liabilities with respect to or based upon loans, indebtedness, promissory notes, debentures, deferred purchase price for property or services, capital lease obligations or similar obligations (or any guaranties of any of the foregoing).

(m)     "Knowledge" or any similar term or knowledge qualification contained herein, means (i) with respect to any individual, the actual knowledge of such Person after being deemed to have conducted reasonable due diligence, and (ii) in the case of any Person other than an individual, the actual knowledge of all key employees, officers, managers and directors of such Person, in each case, after being deemed to have conducted reasonable due diligence.

(n)     "Laws" means any federal, state, provincial, local, municipal, foreign, international, multinational or other administrative law, statute, constitution, ordinance, directive, principle of common law, treaty, pact or framework, rule, regulation, determination, plan, ruling, permit, License, certificate, order or other decision or requirement of any arbitrator, government or other Governmental Authority (domestic or foreign), and any binding judicial or administrative interpretation of any of the foregoing.

(o)     "Liability" means any liability, debt, deficiency, interest, Tax, penalty, fine, claim, demand, judgment, cause of action, obligation or commitment of any kind or nature whatsoever, whether suspected or unsuspected, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, at law or in equity, whether related or unrelated to the Business, whether disclosed or not on the schedules attached hereto, whether due or to become due and regardless of when or by whom asserted, and any cost or expense (including any attorneys' fees) relating thereto.

(p)     "Lien" means any mortgage, pledge, conditional sale or other title retention agreement, encumbrance, lien, easement, option, debt, charge, claim, restriction, or other security interest of any kind.

(q)     "Non-Competition Period" means the period beginning on the Closing Date and ending on the third anniversary of the date of the Closing.

(r)     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a trust, a joint stock company, a joint venture, an unincorporated organization, any other business entity or a Governmental Authority (including any instrumentality, division, agency or department thereof).

(s)     "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion through the Closing Date for any Straddle Period.

(t)     "Proceeding" means any charge, claim, action, cause of action, demand, indictment, allegation, assessment, mediation, investigation, hearing, inquiry, audit, notice of violation, citation, summons, subpoena, dispute, suit, litigation, recall, arbitration or other proceeding or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

(u)    "Proprietary Rights" means all of the following, along with all associated income, royalties, damages, lost profits and payments due from or payable by any third party (including damages and payments for past, present, or future infringements or misappropriations thereof), all other associated rights (including the right to sue and recover for past, present, or future infringements or misappropriations thereof), and any and all corresponding rights that, now or hereafter, may be secured throughout the world: (i) trademarks, service marks, trade dress, logos, slogans, trade names and corporate names and all registrations and applications for registration thereof, together with all goodwill associated therewith; (ii) copyrights and works of authorship, and all registrations and applications for registration thereof; (iii) computer software (including data, data bases and related documentation); (iv) trade secrets, confidential information, and proprietary data and information (including compilations of data (whether or not copyrighted or copyrightable), ideas, know-how, manufacturing protocols, designs and information, formulations and recipes (including historical formulations and recipes), marketing, information, financial and accounting data, business and marketing plans, and customer and supplier lists and related information); (v) domain names, internet sites and related code, social media sites, vendor accounts and memberships (including, but not limited to, Amazon, Facebook, Twitter, Google Plus and Pinterest) graphics, assets and other properties related thereto as well as all rights associated therewith; (vi) all other intellectual property rights; and (vii) all copies and tangible embodiments of the foregoing (in whatever form or medium).

(v)    "Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, escheat, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return).

(w)    "Tax Returns" means returns, declarations, reports, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of Taxes of any party or the administration of any laws, regulations or administrative requirements relating to any Taxes, including any amendment thereof.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

### 2.1    Purchase and Sale of Assets.

(a)    Purchased Assets.  Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 2.5), Buyer agrees to purchase from the Company, and the Company agrees to sell, convey, assign, transfer and deliver to Buyer, with effect from Closing and by appropriate instruments reasonably satisfactory to Buyer, free and clear of all Indebtedness and Liens, an undivided ownership interest in and to all of the assets, properties, rights, titles and interests of every kind and nature owned, licensed to, leased by or otherwise held by the Company and used in or related to the Business (including indirect and other forms of beneficial ownership),

4

whether tangible, intangible or personal and wherever located and by whomever possessed, including all of the following assets, but excluding all of the Excluded Assets (collectively, the "Purchased Assets"):

> (i)     all inventory and related supplies of the Company and all inventory in transit that has been purchased, including but not limited to those items identified as Inventory in Schedule 2.4(d) (collectively, "Inventory");

> (ii)     all tangible assets of any kind;

> (iii)     all claims, deposits, prepayments, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature;

> (iv)     all rights existing under those purchase orders to purchase goods or products as listed on the attached Schedule 2.1(a)(iv) (collectively, the "Assigned Purchase Orders");

> (v)     all rights under any warranties and indemnification obligations (whether implied or express) received from suppliers to the extent they pertain to the Purchased Assets;

> (vi)     the right (but not the obligation) to hire any of the Company's employees, consultants and independent contractors;

> (vii)     all Proprietary Rights, including electronic and hard copies of any custom software programs, data, web pages and all related underlying software and documentation;

> (viii)     all permits, licenses, franchises, and other authorizations obtained from any Governmental Authority or other similar rights, and all data and records pertaining thereto;

> (ix)     all insurance, warranty, litigation, class action and condemnation proceeds received after the date hereof with respect to damage, non-conformance of or loss to the Purchased Assets, or which otherwise pertain to the Business or the activities conducted therefrom or in connection therewith, and all rights and proceeds under insurance policies to the extent related to or payable in connection with any of the Purchased Assets or the Assumed Liabilities, including those that arise under any certificates of insurance from suppliers or their insurers;

> (x)     all rights to receive mail and other communications addressed to the any of the Sellers;

> (xi)     all telephone and facsimile numbers related to the Business;

> (xii)     all social media accounts including, but not limited to, Facebook, Pinterest, Twitter and Instagram;

5

(xiii)   customer lists, price lists and vendor lists and similar items;

(xiv)   copies of books, financial and other corporate records;

(xv)   all historical records, images, commercials, advertisements, brochures and similar items;

(xvi)   all goodwill of the Business and of the Sellers associated with the Business, including the goodwill associated with existing customer relationships of the Business; and

(xvii)   each Contract set forth on Schedule 2.1(a)(xvii) (the "Assumed Contracts").

(b)   Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Contract if an attempted assignment thereof, without consent of a third party thereto, would constitute a breach or other contravention thereof or in any way adversely affect the rights of the Company or Buyer thereunder.  The Sellers and Buyer will use their reasonable best efforts to obtain the consent of the other parties to any such Contract for the assignment thereof to Buyer as Buyer may request.  Unless and until such consent is obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of the Company thereunder so that Buyer would not in fact receive all rights under such Contract, the Sellers and Buyer will cooperate in an arrangement under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing or subleasing to Buyer, or under which the Sellers would enforce, at Buyer's expense, for the benefit of Buyer, with Buyer assuming at Buyer's expense the Sellers' obligations, any and all rights of the Sellers against a third party thereto. The Sellers will promptly pay to Buyer when received all monies received by the Sellers under any Purchased Assets or in connection with the operation of the Business after the Closing Date.

(c)   Excluded Assets.  The Sellers shall retain all of their right, title and interest in and to, and Buyer shall not acquire any right, title or interest in or to, the following assets (collectively, the "Excluded Assets"):

(i)   All bank accounts, cash and cash equivalents on hand;

(ii)   all Company accounts, notes and other receivables;

(iii)   the rights of the Sellers pursuant to this Agreement or any agreements executed and delivered by the Sellers in connection herewith;

(iv)   any retirement plan, health, disability or life insurance plan, or other employee pension benefit plan or employee health or welfare benefits plan;

(v)   the originals of books, financial and other corporate records related to the Business, including Tax Returns, stock and minute books, corporate seal and corporate records of Company (although Buyer shall have the right to request and receive copies of any of these); and

6

(vi)     all Contracts, except to the extent that such Contract is an Assumed Contract.

2.2     **Limited Assumption of Liabilities**.  Subject to the conditions specified in this Agreement, from and after the Closing, Buyer shall assume and agree to pay, perform, discharge and satisfy, as and when due in accordance with their terms, only those liabilities and ordinary course obligations of the Company arising under the terms of any Assumed Contracts, to pay for goods, products, or services to be furnished to Buyer after the Closing, in each case to the extent, and only to the extent, (1) arising out of obligations of performance thereunder which obligations are to be performed solely after the Closing and (2) do not arise out of or in connection with any breach of contract, breach of warranty, tort, infringement, default, nonperformance or violation of Law, or any Action (collectively, the "Assumed Liabilities").  All other Liabilities of the Company associated with the Purchased Assets, including accrued expenses, payroll (including any accrued but unpaid vacation or overtime) and related expenses, notes payable, amounts payable under the Assigned Purchase Orders and other liabilities, will be paid by the Company at or prior to Closing.

2.3     **Excluded Liabilities.**  Notwithstanding anything to the contrary in this Agreement, except for the Assumed Liabilities, Buyer shall not assume, and shall have no liability or obligation for any other Liabilities of any of the Sellers, their Affiliates, the Purchased Assets or the Business (collectively, the "Excluded Liabilities"), including Liabilities of any of the Sellers, their Affiliates, the Purchased Assets or the Business arising out of or related to: (a) any other obligation required to be recorded on a balance sheet of the Company prepared in accordance with GAAP consistently applied throughout the periods covered, in order to truthfully, fairly and accurately present the liabilities and financial condition of Company, (b) Excluded Taxes, (c) Indebtedness, (d) any amounts due to Affiliates or any intercompany or interbranch or interstore liabilities, (e) any Excluded Assets, (f) any trade accounts payable by the Company, whether related to the Business or otherwise, including with respect to the Assigned Purchase Orders, (g) any accrued liabilities, whether related to the Business or otherwise, (h) any present or former employees of the Company (i) any Contract with any Affiliates, (j) any product liability or warranty or defect or other issues of any kind pertaining to products manufactured or sold prior to the Closing Date, or (k) any claims or interest of or by former owners or shareholders of Company, or (l) any default or breach of contract, breach of warranty, tort, infringement, violation of Law or environmental matter.

2.4     **Purchase Price for Purchased Assets.**

(a)     In consideration for the Purchased Assets, Buyer shall pay to the Company at Closing Two Million  Dollars ($2,000,000) (the "Purchase Price"), subject to (a) adjustment pursuant to Section 2.4(b) below, (b) a holdback (the "Holdback") at Closing of One Hundred Thousand Dollars ($100,000) (the "Holdback Amount") pursuant to Section 2.6 below and (c) reduction for the distribution directly to third-party vendors any additional amounts that represent mutually agreed upon liabilities or obligations payable by the Sellers at or prior to Closing but which have not been paid at such time (the "Vendor Payments").  The Purchase Price, as so adjusted, and the Vendor Payments shall be payable on the Closing Date by wire transfer of immediately available funds as set forth in the Funds Flow.

(b)      The Sellers and Buyer have agreed that the Purchase Price contemplates the Company having a net asset value of inventory as of or immediately prior to the Closing Date (the "Closing NAV"), after giving effect to adjustments as provided in Section 2.4(c), of at least One Hundred Ten Thousand Dollars ($110,000) (the "Minimum NAV").  If the Minimum NAV exceeds the Closing NAV, the Purchase Price shall be reduced by the amount equal to the difference between the Minimum NAV and the Closing NAV.

(c)      The parties hereto agree that in determining the Closing NAV, adjustments are to be made to the extent that the balance sheet of the Company as of the Closing Date fails to conform to GAAP consistently applied throughout the periods covered and (even if not consistent with GAAP), as follows: (i) inventory is only counted if it is good and saleable, as determined in Buyer's reasonable discretion, (ii) all inventory has at least 12 months of shelf life (from the date of Closing), (iii) there is more than 8 months of inventory on hand of any individual SKU on the Closing Date based upon the movement of each SKU 8 months prior to the Closing Date; inventory amounts over 8 months are excluded from the calculation of Closing NAV, (iv) inventory may not include overstock or obsolete items, (v) if there is not at least 3 months of inventory for any one SKU based on the immediately prior 6 months average monthly movement, then the Closing NAV is reduced by the difference in inventory value between a calculated 3 months of inventory for each such SKU and the actual inventory at the time of Closing and (vi) in order for inventory to be considered good and saleable, each SKU will be verified to assure that it matches the label and other marketing claims, including information on collateral materials and the website.

(d)      The Closing NAV has been calculated as of the date hereof using the above principles to be $115,651 (the "Estimated NAV") and is set forth on Schedule 2.4(d).

**2.5      Closing of Transactions**.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place on the date hereof (the "Closing Date") by exchange of appropriate documentation between the parties (via overnight delivery, facsimile, electronic transmission and other similar means for exchanging documentation) and the parties will not be required to be in attendance at the same location on the Closing Date.  The Closing shall be deemed effective as of 12:01 a.m. on the Closing Date.

**2.6      Disposition of Holdback Amount**.  In addition to any other rights and remedies available to Buyer and without limiting Buyer's ability to recover for any claims made pursuant to this Agreement, the Holdback Amount will be available to satisfy any other amounts owed by any of the Sellers to Buyer pursuant to this Agreement.  Buyer will give the Sellers notice of any claims against the Holdback Amount in accordance with the indemnification provisions contained in Article VI.  The Holdback Amount, less the amount, if any, (1) previously applied to satisfy Sellers' indemnification obligation to Buyer pursuant to a final disposition of any indemnity claims and (2) sufficient to satisfy any unresolved claims for indemnification by Buyer, shall be released to Seller on December 28, 2018.  If the amount of any unresolved indemnification claim exceeds the amount of the Holdback Amount, the entire remaining balance of the Holdback Amount shall be set aside and retained by Buyer until the final disposition of such claims.

**2.7      Purchase Price Allocation**.  Sellers and Buyer agree to allocate and, as applicable, to cause their relevant Affiliates to allocate, the Purchase Price (as finally determined) and any other items that are treated as additional consideration for Tax purposes among the

Purchased Assets in accordance with this <u>Section 2.7</u> and the methodologies set forth in <u>Schedule 2.7</u> (as finally determined hereunder, the "<u>Allocation Schedule</u>").  No later than 120 days after the date of this Agreement, Buyer shall deliver to Sellers a proposed allocation of the Purchase Price and any other items that are treated as additional consideration for Tax purposes to Sellers determined in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and <u>Schedule 2.7</u>.  None of Sellers, Buyer or any of their respective Affiliates shall take any position inconsistent with the Allocation Schedule on any Tax Return or in any Tax proceeding, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of state, local or foreign law).

   **2.8** **<u>Withholding</u>**.  Notwithstanding any other provision in this Agreement, the Buyer shall have the right to deduct and withhold any required Taxes from any payments to be made hereunder.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to Sellers or any other recipient of payment in respect of which such deduction and withholding was made.  To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts otherwise would have been paid.

**ARTICLE III**
**<u>CLOSING DELIVERABLES</u>**

   **3.1** **<u>Buyer's Closing Deliverables</u>**. At the Closing, Buyer will deliver to the Company:

   (a) A Consulting Agreement, by and between Buyer and the Company (the "<u>Consulting Agreement</u>"), duly executed by Buyer.

   (b) An Assignment and Assumption Agreement and Bill of Sale, by and between Buyer and the Company (the "<u>Assignment and Assumption Agreement and Bill of Sale</u>"), duly executed by Buyer.

   (c) An Assignment of Proprietary Rights by and between Buyer and the Company (the "<u>IP Assignment</u>"), duly executed by the Buyer.

   (d) A flow of funds memorandum (the "<u>Funds Flow</u>"), duly executed by the Buyer.

   (e) The Purchase Price, in accordance with the Funds Flow, and subject to <u>Section 2.4</u>.

   **3.2** **<u>Sellers' Closing Deliverables</u>**. At the Closing, the Sellers will deliver to the Buyer:

   (a) Title and possession of the Purchased Assets along with such appropriately executed instruments of sale, transfer, assignment, conveyance and delivery, and all other

9

instruments of conveyance which are necessary or desirable to effect transfer to Buyer of good and valid title to the Purchased Assets (free and clear of all Liens).

(b)     The Assignment and Assumption Agreement and Bill of Sale, duly executed by the Company.

(c)     The Consulting Agreement, duly executed by the Company.

(d)     The IP Assignment, duly executed by the Company.

(e)     The Funds Flow, duly executed by the Sellers.

(f)     All consents by third parties that are required for the transfer of the Purchased Assets to Buyer, or that are required for the consummation of the transactions contemplated hereby, or that are required in order to prevent a breach of, a default under or a termination or cancellation (including giving rise to a right of termination or cancellation), acceleration of any rights or material modification of any Contract to which the Company is a party or to which any material portion of the property of the Company is subject.

(g)     Payoff letters and releases of any and all Liens with respect to any Indebtedness of the Company and relating to the Purchased Assets, all on terms reasonably satisfactory to Buyer.

(h)     Payoff letters with respect to any expenses incurred by Sellers in connection with this Agreement, including with any brokers.

(i)     Certified copies of (1) the Company's articles of organization, operating agreement and/or other governing documents and (2) the resolutions of Company's managers and members approving the transactions contemplated by this Agreement.

(j)     A non-foreign affidavit from the Company, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that the Company is not a "foreign person" as defined in the Code, such that Buyer is not required to withhold any portion of the purchase price hereunder.

(k)     Such other documents or instruments as Buyer reasonably requests to effect the transactions contemplated hereby.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES
### OF THE SELLERS

The Sellers jointly and severally represent and warrant to Buyer that the statements contained in this Article IV are true, correct and complete in all respects as of the date of this Agreement.

**4.1**     **Organization and Corporate Power.**  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of Wyoming with

27365714.3

full power and authority to conduct the Business as it is presently being conducted and to own and lease its properties and assets. The Company is duly qualified to do business as a foreign limited liability company and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities make such qualification necessary. Copies of the certificate of formation, operating agreement and other governing documents of the Company, and all amendments thereto, heretofore delivered to Buyer are accurate and complete as of the date hereof. Schedule 4.1 contains a true, correct and complete list of all jurisdictions in which the Company is qualified to do business as a foreign limited liability company.

### 4.2    **Authorization of Transactions; Ownership.**

(a)    The Company has full limited liability company power and authority to execute and deliver this Agreement, and any other agreement contemplated hereby, and perform all of its obligations hereunder or thereunder. Without limiting the generality of the foregoing, the managers and members of the Company have duly authorized the execution, delivery, and performance of this Agreement, and any other agreement contemplated hereby, by the Company and no other proceedings on the part of the Company or any other Person are necessary to authorize the execution, delivery or performance of this Agreement and any other agreement contemplated hereby. This Agreement constitutes the valid and legally binding obligation of the Sellers, enforceable in accordance with its terms and conditions.

(b)    All of the issued and outstanding equity securities of the Company have been duly authorized, validly issued, and are fully paid and non-assessable. There are no outstanding options, warrants or other rights granted to any Person that entitle such Person to acquire, or obligate the Company to issue, sell, purchase, redeem, or retire, any security. The Company does not have outstanding any securities convertible into or exchangeable for any securities or containing any profit participation features, or any appreciation rights or phantom plan. Schedule 4.2(b) sets forth the authorized and issued and outstanding securities of the Company, the name of each record holder of such equity interest, and the number of equity interests held by each such record holder.

(c)    The Company does not have, and has never had, any subsidiaries and does not own, and has never owned, directly or indirectly, any stock, partnership interest, joint venture interest or other equity ownership interest in any other Person. The Business has never been conducted through any other direct or indirect subsidiary or any Affiliate of any Seller.

### 4.3    **Non-Contravention.** Neither the execution and the delivery by the Sellers
of this Agreement or any other agreements as contemplated herein to which any Seller is a party, the performance by it of its obligations hereunder or thereunder, nor the consummation by it of the transactions contemplated hereby or thereby, will: (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction or Law of any Governmental Authority to which such Seller is subject or any provision of the certificate of formation, operating agreement or any other governing documents of the Company; (ii) conflict with, result in any breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which the Company is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets); or (iii) require the giving of notice to,

11

making of any filing with, or obtaining any authorization, consent, approval, exemption or other action of any Person.

### 4.4    Financial Statements.

(a)    Set forth in Schedule 4.4(a) are the true, complete and correct copies of the unaudited income statements of the Company as of (i) March 31, 2018, (ii) December 31, 2017, and (iii) December 31, 2016, and true, complete and correct copies of the Federal and State Income Tax returns and supporting schedules for calendar years 2017 and 2016.  Except as set forth in Schedule 4.4(a), each of the foregoing financial statements (including in all cases the notes thereto, if any) (collectively, the "Financial Statements") (x) is true, correct and complete, is based upon and consistent with information contained in the books and records of the Company (which books and records are true, correct and complete), (y) has been prepared in accordance with GAAP consistently applied by the Company throughout the periods covered, and (z) fairly presents, in all material respects, the consolidated financial condition and results of operations and cash flows of the Company as of the respective dates thereof and for the respective periods indicated therein. No financial statements of any Person other than Company would be required by GAAP to be included or reflected in the Financial Statements.

### 4.5    Title to and Condition of Assets.

(a)    The Company has good and marketable titles to, or a valid leasehold interest in, the properties and assets used by it, located on its premises, or shown on Schedule 2.4(d), free and clear of all Liens.  Without limiting the generality of the foregoing, the Company has good and marketable title to all of the Purchased Assets, free and clear of any Liens or restriction on transfer. At the Closing, the Company will convey good and marketable title to all of its personal property and assets included within the Purchased Assets, free and clear of all Liens.  The Purchased Assets so conveyed will include all of those assets (real, personal, tangible and intangible) necessary to conduct the Business in substantially the same manner as presently conducted and all assets used during the 12 months immediately prior to the Closing Date (other than inventory sold to third parties or consumed in the ordinary course of business and worn out or obsolete fixed assets disposed of in the ordinary course of business) and will enable Buyer to operate the Business in substantially the same manner as operated by the Sellers during the 12-month period immediately prior to the Closing Date.

(b)    The Purchased Assets owned or otherwise used by the Company in the conduct of its business are in satisfactory operating condition and repair and are usable in the ordinary course of business, subject only to ordinary wear and tear and the provision of usual and customary maintenance and repair performed in the ordinary course with respect to similar properties of like age and construction.

### 4.6    Absence of Undisclosed Liabilities.    The Company has no material Liabilities, except for (i) Liabilities that have arisen after the most recent fiscal month end in the ordinary course of business (none of which is a result of a breach of Contract, tort, or violation of Law); and (ii) those Liabilities disclosed in Schedule 4.6.

27365714.3

**4.7**   **Absence of Certain Developments.**  Except as set forth in <u>Schedule 4.7</u>, and except as expressly contemplated by this Agreement, since December 31, 2017, the Company has not:

(a)   suffered a material adverse change in the Business or financial condition or operating results or earnings or assets or customer, supplier, contractor or employee and sales representative relations, or business condition or financing arrangements of the Company and there has been no material casualty loss or damage to the assets of the Company (whether or not covered by insurance);

(b)   suffered any extraordinary losses or waived in writing any rights of significant value, whether or not in the ordinary course of business or consistent with past custom and practice; or

(c)   suffered any theft, damage, destruction or casualty loss in excess of $2,000 per incident and $4,000 in the aggregate, to their respective tangible assets associated with or used in the Business, whether or not covered by insurance, or suffered any substantial destruction.

**4.8**   **Real Property**.  The Company does not, and has not, owned real property.

**4.9**   **Business Systems; Data Security.**  The Company owns, leases, licenses, or otherwise has the legal right to use all Business Systems, and such Business Systems are sufficient for the immediate and anticipated future needs of the Company's Business as it is currently conducted.  The Company maintains commercially reasonable security, disaster recovery and business continuity plans, procedures and facilities, and such plans and procedures have been proven effective upon testing in all material respects, and in the last 12 months, there has not been any material failure with respect to any of the Business Systems that has not been remedied or replaced in all respects. The Company and the conduct of the Business are in compliance with, and have been in compliance with all Data Security Requirements and there have not been any actual or alleged incidents of data security breaches, unauthorized access or use of any of the Business Systems, or unauthorized acquisition, destruction, damage, disclosure, loss, corruption, alteration, or use of any data or information or other notices received relating to Data Security Requirements. The transactions contemplated by this Agreement will not result in any Liabilities in connection with any Data Security Requirements.

**4.10**   **Inventory.**  All of the Inventory of the Company, including as reflected on <u>Schedule 4.10</u>, whether located at Amazon Fulfillment Centers, at copackers, in transit or elsewhere, are of a quantity and quality usable and saleable in the ordinary course of business, are not damaged or defective and are merchantable.  All of the Inventory consists of bona fide assets. All of the Inventory of the Company, whether located at Amazon or elsewhere, are properly reflected on the Company's books and records and are not the subject of any counterclaim, or a claim for a charge-back, deduction, credit, set-off or other offset, or any claim of a party-in-possession, such as a claim for a Lien or other restriction.  All of the Inventory are in compliance with all applicable Laws, including those pertaining to labeling and packaging.

**4.11**   **Taxes**.

13

(a)     Company has filed all Tax Returns that it was required to file.  All such Tax Returns were correct and complete in all material respects.  All material Taxes owed by each Seller or with respect to the Business, the Purchased Assets and the Assumed Liabilities (whether or not shown on any Tax Return) have been paid.  No Seller is currently the beneficiary of any extension of time within which to file any Tax Return.  Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.  There are no Liens for Taxes on any of the Purchased Assets.

(b)     There is no dispute or claim concerning any Tax liability of any Seller, the Business, the Purchased Assets or the Assumed Liabilities either (A) claimed or raised by any authority or (B) as to which the Sellers or any of the managers and officers of the Company has Knowledge.  No deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any taxing authority against the Sellers, the Business, the Purchased Assets or the Assumed Liabilities.

(c)     No agreement, waiver or other document or arrangement extending or having the effect of extending the period for the assessment of collection of Taxes (including, but not limited to, any applicable statute of limitation), has been executed or filed with the IRS or any other taxing authority by, on behalf of or with respect to the Company, the Business, the Purchased Assets or the Assumed Liabilities and no power of attorney with respect to any Tax matter is currently in force.

(d)     No Assumed Liability is, and the Company has not made any payments, is not obligated to make any material payments, or is not a party to any agreement that under certain circumstances could obligate it to make any material payments that will not be deductible under Code §280G. The Company is not a party to any, and no Assumed Liability is a, Tax allocation or sharing agreement.  None of the Assumed Liabilities is a contract, arrangement, or plan of the Company that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1)) of the Code that is not in documentary and operational compliance with Section 409A of the Code and the applicable guidance issued thereunder in all material respects.  None of the Assumed Liabilities is an indemnity obligation for any Taxes imposed under Section 4999 or 409A of the Code.

(e)     The Company (A) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) or (B) has any liability for the Taxes of any Person (other than the Company) under Reg. §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(f)     The unpaid Taxes of the Company and the Business (A) do not, as of the most recent fiscal month end, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Financial Statements (rather than in any notes thereto) and (B) will not exceed that reserve as adjusted for operations and transactions through the Closing Date in accordance with the past custom and practice of the Company and the Business filing its Tax Returns.

27365714.3

(g)     No claim has been made (other than the United Kingdom) by a taxing authority within the past three (3) years in a jurisdiction where the Company or the Business does not pay Tax or file Tax Returns that the Sellers, the Business or the Purchased Assets is or may be subject to Taxes assessed by such jurisdiction.

(h)     Seller and Owner will remain liable for all unpaid taxes due any jurisdiction where Company does business which includes but is not limited to all federal and state Taxes, sales Taxes, VAT Taxes and sales Taxes.

(i)     Buyer will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any prepaid amount received on or prior to the Closing Date.

(j)     The Company has been treated as a partnership for federal (and, as applicable, state and local) income Tax purposes at all times during its existence.

**4.12     Contracts and Commitments**.

(a)     Except as set forth on Schedule 4.12(a), the Company is not a party to or bound by, whether written or oral, any Contract related to the Business.  The Company is not party to, and the Business and the Purchased Assets are not bound by, any Contract (i) limiting Company's ability to conduct the Business or limiting another Person's ability to compete with Company with respect to the Business, (ii) providing any customer with "most favored customer" or similar pricing or benefits or (iii) granting any Person an exclusive right to offer, distribute or resell services or products offered or sold by Company in connection with the Business.

(b)     The Company has delivered to Buyer a complete copy of each written Contract listed in Schedule 4.12(a) (as amended to date) and a written summary setting forth the material terms and conditions of each oral Contract referred to in Schedule 4.12(a).  With respect to each such Contract: (i) the Contract is legal, valid, binding, enforceable, and in full force and effect in all material respects; (ii) the Company is not, and to the Knowledge of the Sellers, no other party is in material breach or default, and, to the Knowledge of the Sellers, no event has occurred that with notice or lapse of time would constitute a material breach or default, or permit the termination, modification, or acceleration, under the Contract; and (iii) to the Knowledge of the Sellers, no party has repudiated any material provision of the Contract.

**4.13     Proprietary Rights**.

(a)     Neither the Company nor the Owner have interfered with, infringed upon, misappropriated, or violated any Proprietary Rights of third parties, and none of the Company, the Owner and the Company's directors, managers and officers has ever received any claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation. No third party has interfered with, infringed upon, misappropriated, or violated any Proprietary Rights of Company.

(b)     The Company owns or has the right to use, pursuant to a valid license, free and clear of all Liens, all Proprietary Rights which are necessary for the conduct of the Business. Schedule 4.13(b) sets forth a complete and correct list of (i) all registered and all material

unregistered Proprietary Rights (including domain names), including all pending applications for registration of Proprietary Rights owned, filed or used by Company or in connection with the Business, identifying the Proprietary Rights and whether such Proprietary Right is an owned Proprietary Right or a licensed Proprietary Right (and, in the case of a licensed Proprietary Right, listing the applicable owner), (ii) all inbound and outbound license agreements with respect to Proprietary Rights, whether written or oral, identifying for each: (v) the parties thereunder, (w) the date thereof, (x) the type of license (including the term thereof), (y) the Proprietary Rights licensed thereunder, and (z) whether Company is granting or receiving Proprietary Rights thereunder and (iii) software that is owned, licensed, leased or otherwise used by Company in connection with the Business and identifying which of such software is owned, licensed, leased or otherwise used, as the case may be.  Company has delivered to Buyer correct and complete copies of all such registrations, applications, licenses, agreements, and permissions (as amended to date).

(c)     The Proprietary Rights of the Company are valid and subsisting in full force and effect, and have not been cancelled, expired or abandoned.  All of the Company's rights in and to the Proprietary Rights owned or used by the Company in connection with the Business are freely assignable by the Company and all of such Proprietary Rights will be owned or available for use by Buyer on identical terms and conditions immediately after the Closing.

**4.14**     **Litigation; Proceedings**.  There are no Proceedings pending or, to the Knowledge of the Sellers, threatened against the Company.  Neither Seller nor any portion of the Business is subject to any judgment, award, determination, order, stipulation, writ, injunction or decree entered by or with any Governmental Authority.

**4.15**     **Brokerage Fees**.  None of the Sellers have authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement, except for www.websiteclosers.com, as to which the Sellers shall have sole responsibility for any brokerage fees owing as well as to any other third party.  Brokerage fees payable by Seller and Owner will be deducted from the Purchase Price and paid at the Closing as part of the Funds Flow.

**4.16**     **Governmental Licenses and Permits**.  Schedule 4.16 contains a complete listing and summary description of all permits, licenses, franchises, certificates, approvals and other authorizations of foreign, federal, state and local governments (collectively, the "Licenses") owned or possessed by the Company or used by the Company in the conduct of its business.  The Company owns or possesses all right, title and interest in and to all of the Licenses which are necessary to conduct its business as presently conducted.  No loss or expiration of any License is threatened, pending or reasonably foreseeable other than expiration in accordance with the terms thereof.

**4.17**     **Employees**.  The Company has no employees and has not previously had employees.

**4.18**     **Compliance with Laws.**  The Sellers are not and have not been in violation of any Laws applicable to such Seller or relating to the Business or the Purchased Assets.  The Sellers have not been charged or, to the Knowledge of the Sellers, threatened with any charge

16

concerning any violation of any provision of any Law relating to the Business or the Purchased Assets that has not already been duly cured and for which there is no remaining Liability. Without limiting the generality of the foregoing, there have been no product recalls, withdrawals or seizures with respect to any products developed, sold, licensed or delivered by the Sellers with respect to the Business.

        **4.19**   **Product Warranty**.  Except as set forth on <u>Schedule 4.19</u>, no product of the Business manufactured, sold, licensed, leased or delivered to any party is subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale or lease, other than statutory warranties.  Except as set forth in <u>Schedule 4.19</u>, within the three years prior to the date of this Agreement, there have been no breaches of any warranty of any product of the Business manufactured, sold or delivered to any party.  <u>Schedule 4.19</u> includes copies of such standard terms and conditions of sale for the Company.

        **4.20**   **Insurance.**  The attached <u>Schedule 4.20</u> (the "<u>Insurance Schedule</u>") sets forth an accurate description of each insurance policy to which the Company has been a party, a named insured or otherwise the beneficiary of coverage at any time during the past two years with respect to the Business.  All of such insurance policies are legal, valid, binding and enforceable and in full force and effect, and the Company has not (and has never been) in breach or default with respect to their obligations under such insurance policies.

        **4.21**   **Sufficiency of Assets.**  The Purchased Assets include all of the rights, title and interest (i) used or held for use in the conduct of the Business, (ii) necessary for the operation of the Business, (iii) utilized by the Company to generate the financial results reflected in the Financial Statements and (iv) necessary to permit Buyer to conduct the Business after the Closing in a manner substantially equivalent to the manner as it is being conducted on the date of this Agreement and has been conducted in the 12-months prior to the date of this Agreement.  Except for the Excluded Assets, no officer, director, employee or equityholder of the Company owns any asset or property used in or pertaining to the Business of the Company.

        **4.22**   **Disclosure**.  Neither this Agreement, nor any other agreements delivered pursuant hereto and the schedules, attachments or exhibits hereto and thereto, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

        Buyer represents and warrants to the Sellers that the statements contained in this <u>Article V</u> are correct and complete as of the date of this Agreement.

        **5.1**   **Corporate Organization and Power.**  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida.

        **5.2**   **Authorization.**  Buyer has full limited liability company power and authority to execute and deliver this Agreement, and any other agreement contemplated hereby, and perform all of its obligations hereunder or thereunder.

27365714.3

# ARTICLE VI
## INDEMNIFICATION AND RELATED MATTERS

**6.1** **Survival.** All representations and warranties set forth in this Agreement shall survive the Closing Date and the consummation of the transactions contemplated hereby (regardless of any investigation by or on behalf of the damaged party or the acceptance of any certificate) and continue in full force and effect until the fifth anniversary of the Closing Date (the "Survival Period"); provided that if a claim for indemnification is made in connection with any representation or warranty set forth in this Agreement, the Survival Period will be extended with respect solely to such representation or warranty until the date of final determination of such claim. Notwithstanding the foregoing, (i) the representations and warranties set forth in Sections 4.1, 4.2, 4.3, 4.5(a) and 4.15 shall survive the Closing Date and the consummation of the transactions contemplated hereby and continue in full force and effect until the tenth anniversary of the Closing Date, (ii) the representations and warranties set forth in Section 4.11 shall survive the Closing Date and the consummation of the transactions contemplated hereby and continue in full force and effect until the earlier of (x) the seven (7) year anniversary of the Closing Date and (y) the date that is sixty (60) days following the date of expiration of the statute of limitations applicable thereto, and (iii) all covenants and agreements shall survive the Closing Date and the consummation of the transactions contemplated hereby and continue in full force and effect.

**6.2** **Indemnification**.

(a)     Subject to the limitations set forth in this Article VI, the Sellers, jointly and severally, shall indemnify, defend and hold harmless Buyer and its officers, directors, agents, employees, equity holders, partners, successors, assigns and Affiliates from and against any and all loss, Liability, deficiency, damage, diminution in value or expense (including reasonable legal expenses and costs and including interest and penalties) (a "Loss") arising out of, relating to or resulting from (i) any breach (or any third party allegation that, if true, would constitute a breach) of a representation or warranty of the Sellers, contained in this Agreement or in any other agreement contemplated herein or in any writing delivered in connection herewith (including any attachment, exhibit, schedule or certificate) (which breach shall be determined for purposes of this Article VI without regard to any qualification based on knowledge or the Sellers' Knowledge with respect to any representation or warranty made in Article IV), (ii) any breach by the Sellers of any of the covenants set forth in this Agreement, (iii) the amount by which the Estimated NAV exceeds the Closing NAV (but only if the Closing NAV is less than the Minimum NAV) or (iii) any of the Excluded Liabilities.  For purposes of Section 6.2(a)(i), in determining whether there has been a breach or alleged breach of any representation or warranty, and in calculating the amount of any Loss with respect to any such breach, all qualifications in such representation or warranty referencing the terms "material," "materiality," "material adverse effect" or other terms of similar import or effect shall be disregarded.

(b)     Subject to the limitations set forth in this Article VI, Buyer shall indemnify, defend and hold harmless the Sellers and their directors, agents, employees and Affiliates from and against any and all Loss arising out of, relating to or resulting from (i) any breach of a representation or warranty of Buyer, contained in this Agreement or in any other agreement contemplated herein or in any writing delivered in connection herewith (including any attachment, exhibit, schedule or certificate) (which breach shall be determined for purposes of this Article VI

18

without regard to any qualification based on knowledge or Buyer's Knowledge with respect to any representation or warranty made in Article VI), or (ii) any breach by Buyer of any of the covenants set forth in this Agreement.

(c)     Any party making a claim for indemnification under this Section 6.2 (an "Indemnified Party") must give the indemnifying party (the "Indemnifying Party") written notice of such claim describing such claim and the nature and amount of the Loss, to the extent that the nature and amount thereof are determinable at such time (a "Claim Notice") within forty-five (45) days after the Indemnified Party receives notice from a third party with respect to any matter which may give rise to a claim for indemnification against the Indemnifying Party (a "Third Party Claim"); provided, that the failure to notify or delay in notifying the Indemnifying Party will not relieve the Indemnifying Party of its obligations under this Section 6.2 except to the extent such claim is materially prejudiced as a result thereof.  Within thirty (30) days after receipt of a Claim Notice with respect to a Third Party Claim, the Indemnifying Party may assume the defense of such matter; provided, that (1) the Indemnifying Party shall retain counsel reasonably acceptable to the Indemnified Party, (2) the Indemnified Party may participate in the defense of such claim, at its own expense, with co-counsel of its choice to the extent that the Indemnified Party believes in its sole discretion that such matter shall affect its ongoing business, (3) the Indemnifying Party shall confirm to the Indemnified Parties in writing that such Indemnifying Party shall be responsible and liable for all Losses arising out of such action or other claim giving rise to such claim for indemnification hereunder and (4) the Indemnifying Party may not consent to the entry of any judgment with respect to the matter or enter into any settlement with respect to the matter which (x) does not contain a full and final release of the Indemnified Party from all liability relating to the subject matter of the settlement, (y) requires an admission of wrongdoing by the Indemnified Party or (z) provides for injunctive or other non-monetary relief against the Indemnified Party or any of its Affiliates.  If, within such thirty (30)-day period, the Indemnifying Party does not assume the defense of such matter, the Indemnified Party may defend against the matter in any manner that it reasonably may deem appropriate and may consent to the entry of any judgment with respect to the matter or enter into any settlement with respect to matter without the consent of the Indemnifying Party.  The Indemnified Party shall cooperate with the Indemnifying Party in all matters arising under this Section 6.2.

(d)     With respect to any matter which does not involve a Third-Party Claim, prior to expiration of the applicable limitation date, the Indemnified Party must give the Indemnifying Party a Claim Notice promptly after such Indemnified Party discovers the liability, obligation or facts giving rise to such claim for indemnification; provided, that the failure to notify or delay in notifying the Indemnifying Party will not relieve the Indemnifying Party of its obligations under this Section 6.2 except to the extent such claim is materially prejudiced as a result thereof. The Indemnifying Party may object to a Claim Notice by delivering written notice to the Indemnified Party of the Indemnifying Party's objection (an "Objection Notice"). Such Objection Notice must describe the grounds for such objection in reasonable detail. If an Objection Notice is not delivered by the Indemnifying Party to the Indemnified Party within thirty (30) days after delivery by the Indemnified Party of the Claim Notice, such failure to so object will be an irrevocable acknowledgment by each party to this Agreement that the Indemnified Party is entitled to indemnification for the Loss set forth in such Claim Notice in accordance with this Section 6.2.

6.3     **Adjustments.**  Amounts paid by any Party as indemnification payments shall be treated as adjustments to the Purchase Price (including, for the avoidance of doubt, for Tax purposes).

**ARTICLE VII**
**ADDITIONAL AGREEMENTS**

7.1     **Continuing Assistance.**  Subsequent to the Closing, the parties hereto shall, at their own cost, assist each other (including making records available) in the preparation of their respective Tax Returns and the filing and execution of Tax elections, if required, as well as any audits or litigation that ensue as a result of the filing thereof, to the extent that such assistance is reasonably requested.  Such assistance shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

7.2     **Tax Matters.**

(a)     All sales and transfer Taxes, deed Taxes, conveyance fees, recording charges, documentary, use, stamp, registration and other such Taxes and fees (including any penalties and interest) (collectively, "Transfer Taxes"), if any, incurred in connection with Closing or the sale or transfer of any of the Purchased Assets to Buyer shall be paid by the Sellers when due, and such parties will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

(b)     In the case of any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes based on or measured by income, receipts, withholding, sales, or payroll attributable to the Purchased Assets for the Pre-Closing Tax Period shall be determined based on an interim closing of the books of as of the close of business on the Closing Date and the amount of other Taxes attributable to the Purchased Assets for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

7.3     **Press Releases and Announcements.**  Prior to the Closing Date, no press releases related to this Agreement and the transactions contemplated herein, or other announcements to the employees, customers or suppliers of the Company will be issued without the mutual approval of all parties hereto, except Buyer may make any public disclosure which Buyer in good faith believes is required by law or regulation.

7.4     **Further Actions.**  The Sellers shall execute and deliver such further instruments of conveyance and transfer and the parties will take such additional action as any other party may reasonably request to effect, consummate, confirm or evidence the transfer to Buyer of the Purchased Assets and any other transactions contemplated by this Agreement.  Without limiting the foregoing, if the Company and Buyer are unable to complete the transfer of the

20

Company's Amazon Seller Account to Buyer and/or direct any post-Closing revenue of the Business from other bank accounts of Sellers to one or more bank accounts of Buyer, then Sellers will assist in the transition of such account and/or payments until completed.  In all events, if any Seller receives any payments relating to the operation of the Business after Closing, Sellers shall remit such payments to Buyer in the form received within 1 business day of such Seller's receipt of such payments.

  **7.5** **Specific Performance.** The Sellers acknowledge that the Business is unique and recognizes and affirms that in the event of a breach of this Agreement by any of such parties, money damages may be inadequate and Buyer may have no adequate remedy at law. Accordingly, the Sellers agree that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and such parties' obligations hereunder not only by an action or actions for damages under the indemnification provisions of <u>Article VI</u> but also by an action or actions for specific performance, injunctive or other equitable relief.

  **7.6** **Fees and Expenses.** Except as otherwise provided herein, the parties hereto shall pay all of their own fees and expenses (including, if incurred, fees and expenses of legal counsel, investment bankers, brokers or other representatives and consultants and appraisal fees and expenses) incurred in connection with the negotiation of this Agreement, the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby.

  **7.7** **Books and Records.** After the Closing, the Sellers shall allow Buyer's representatives, attorneys and accountants access to the Company's books and records, upon reasonable request and during such party's normal business hours, for the purpose of examining and copying the same in connection with any matter whether or not relating to or arising out of this Agreement or the transactions contemplated hereby.

**ARTICLE VIII**
**MISCELLANEOUS**

  **8.1** **Amendment and Waiver.** No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the parties hereto.  All waivers of rights under this Agreement shall be in writing, and no waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty, covenant or agreement hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No course of dealing between or among any Persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any party under or by reason of this Agreement.

  **8.2** **Notices**.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly received when (i) delivered personally to the recipient, (ii) delivered to the recipient through electronic means (including by electronic mail) (provided that receipt is confirmed promptly thereafter other than by automatic response (*e.g.*, out-of-office reply)), (iii) five business days after it is sent by certified or registered mail with postage prepaid

21

or (iv) two business days after it is sent to the recipient by reputable express courier service (charges prepaid), and addressed to the intended recipient as set forth below:

(i)      If to the Sellers, to:

Flamaggio LLC
c/o Berenika Maciejewiez
412 N Main St, Ste 100
Buffalo, WY 82834

With a copy to:

(ii)     If to Buyer or Owner, to:

Seabrella LLC
c/o Sergio Diaz
704 West Bay Street
Tampa, FL 33606
1 (813) 830-3252

With a copy to, which shall not constitute notice, to:

Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226
Email:  jopperer@honigman.com
Attn:  Joshua F. Opperer

(b)      Any party hereto may from time to time change its address for the purpose of notices to such party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

### 8.3      Binding Agreement; Assignment.

(a)      This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(b)      No party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other party; *provided, however*, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates, (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder) or (iii) collaterally assign all of Buyer's rights, interests and benefits under this Agreement to Buyer's financing sources.

**8.4     Severability.**  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**8.5     Entire Agreement.**  This Agreement, together with the Exhibits, Schedules and other documents referred to herein contain the entire agreement between the parties and supersede any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.  There are no agreements, covenants or undertakings with respect to the subject matter of this Agreement other than those expressly set forth or referred to herein.

**8.6     Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which taken together will constitute one and the same instrument. This Agreement may be executed by facsimile or .pdf signature (including sent via email) and a facsimile or .pdf signature shall constitute an original for all purposes.

**8.7     Governing Law.**  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties hereto further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court shall constitute valid and lawful service of process against them, without necessity for service by any other means provided by statute or rule of court.

**8.8     Waiver of Jury Trial.**  EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.8</u>.

**8.9     Restrictive Covenants.**

(a)     The Sellers, if requested by Buyers in writing, shall deliver to Buyer as soon as practicable following the Closing Date, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documentation (and copies thereof) relating to the Business which the Sellers may possess or have under their control.  The Sellers agree that during the Non-Competition Period, the Sellers will not (and will cause their Affiliates not to), directly or indirectly, either for themselves or for any other person, partnership, corporation or company, (1) permit their names to be used by, engage or participate in any business or enterprise that provides services similar to or competitive with those of the Business or any business in any manner competitive with the Business anywhere within the United States of America or elsewhere, (2) induce or attempt to induce any employee or independent contractor of Buyer or any of its Affiliates to leave the employ or engagement of Buyer or any of its Affiliates and (3) cause, induce or encourage, or attempt to cause, induce or encourage, any current, former or prospective vendor, customer, supplier, referral source, licensor, independent contractor or other business relation of Buyer or any of its Affiliates from time to time to cease, or modify its manner or terms of or prospects for, doing business with Buyer or any of its Affiliates, or in any way interfere with the relationship between any such vendor, customer, supplier, referral source, licensor, independent contractor or other business relation, on the one hand, and Buyer or any of its Affiliates, on the other hand.

(b)     Each Seller agrees not to disclose or use at any time (and to cause each of his, her or its Affiliates not to use or disclose at any time) any Confidential Information.  Each Seller further agrees to take all reasonable appropriate steps (and to cause each of her or its Affiliates to take all appropriate steps) to safeguard such Confidential Information.  In the event any Seller is compelled by Law to disclose any Confidential Information, such Seller will promptly notify Buyer in writing, which notification will include the nature of the legal compulsion and the extent of the compelled disclosure, and will reasonably cooperate with Buyer to preserve the confidentiality of such information consistent with applicable Law.  As used herein, "Confidential Information" means all information of a confidential, non-public or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Business, including products, services or research or development of the Company or its suppliers, distributors, customers, independent contractors or other business relations.

(c)     The parties hereto agree that Buyer would suffer irreparable harm from a breach by the Sellers of any of the covenants or agreements contained in this <u>Section 8.9</u> and that money damages would not be an adequate remedy for any such breach.  In the event of a breach or threatened breach by the Sellers of any of the provisions of this <u>Section 8.9</u>, Buyer or its successors or assigns, in addition to all other rights and remedies existing in its favor, shall be entitled to specific performance and/or injunctive or other equitable relief from any court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (including the extension of the Non-Competition Period by a period equal to the length of the violation of this <u>Section 8.9</u>), without posting any bond or other security.  In the event of an alleged breach or violation by the Sellers of any of the provisions of this <u>Section 8.9</u>, the Non-Competition Period described above shall be tolled until such alleged breach or violation has been duly cured.  The Sellers agree that these restrictions are reasonable with respect to duration, geographical area and scope.  If, at the time of enforcement of any of the provisions of this <u>Section 8.9</u>, a court holds that the restrictions stated therein are unreasonable under the circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such

circumstances shall be substituted for the stated period, scope or area. The Sellers agree that the covenants made in Section 8.9 shall be construed as an agreement independent of any other provision of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision of this Agreement.

        **8.10**   **Bulk Sales Laws.** Buyer hereby waives compliance by the Sellers and the Sellers hereby waive compliance by Buyer with the provisions of the "bulk sales", "bulk transfer" or similar laws of any jurisdiction other than any laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

        **8.11**   **Corporate Names**. The Seller and Owner agree to cease using the dba "ZenZoi" or any other names that are part of the Business as soon as possible after Closing, and in any case within 10 business days of Closing, to a name that is not confusingly similar to any of the trade names, trademarks or proprietary rights being conveyed to Buyer hereunder.

        **8.12**   **Fees and Expenses.** In the event of any action, suit or other proceeding concerning or arising out of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its reasonable expenses, attorneys' fees and costs incurred in connection with such action or in enforcement or collection of any judgment or award rendered therein.

        **8.13**   **Interpretation**. Unless the context otherwise requires, (a) any reference in this Agreement to an Article, Section, or Schedule will be considered a reference to an Article, Section, or Schedule of this Agreement, and any reference to a sub-section or paragraph is to the relevant sub-section or paragraph of the Article, Section, or Schedule in which it appears; (b) the Article, Section, and Schedule headings are included for convenience only and will not modify or affect the construction or interpretation of this Agreement; (c) references to "dollars" or "$"will mean U.S. Dollars; (d) the term "including" and similar terms will be deemed to be immediately followed by the phrase "without limitation"; and (e) notwithstanding that this Agreement may have been drafted or prepared by one of the parties, each of the parties confirms that: (i) such party and its counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the parties, (ii) the language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and (iii) if an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any Person by virtue of the authorship of any of the provisions of this Agreement.

*      *      *

27365714.3

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**Seabrella LLC**
**A Florida Limited Liability Company**

By: _____

Its: _____
 Sergio Diaz
 President

**COMPANY:**

**Flamaggio LLC**
**A Wyoming Limited Liability Company**

_____
Berenika Maciejewicz, as Manager

**OWNER:**

_____
Berenika Maciejewicz