# EXHIBIT B

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "Agreement") is made and entered effective as of April 25, 2018 (the "Effective Date"), by and among the entity identified on the signature page as "Company" ("Company"), the party identified on the signature page as "Consultant" ("Consultant"), and individuals identified on the signature page as "Key Individual" (together with the Consultant, the "Consultant Parties"). Consultant, the Key Individual and the Company are sometimes hereinafter referred to individually or collectively as a "Party" or the "Parties."

WHEREAS, Company, Consultant and Key Individual are parties to a separate Asset Purchase Agreement of even date herewith (the "Purchase Agreement") pursuant to which Company purchased substantially all of the assets associated with the "ZenZoi" brand and business, and the execution and delivery of this Agreement was a condition precedent to closing under the Purchase Agreement. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.0   Definitions.   As used in this Agreement, "Work Product" means ideas, designs, inventions, formulas, innovations, developments, methods, analyses, drawings, reports, improvements, data, processes, products, writings, as well as any documentation and all similar or related information (whether patentable or not and whether written or unwritten), that Consultant Parties may learn about, work on, create, conceive of, invent, review, modify, enhance, write, or otherwise develop, in whole or in part, in connection with the Services to be provided under this Agreement.

2.0   Selection of and Work to be Done by Consultant.

2.1   Consultant shall be responsible for providing the services set forth in Exhibit A, attached hereto and incorporated herein by reference ("Services"). In connection with the Services, Consultant shall provide deliverables to and take its general instructions from authorized officer(s) of Company. Consultant's Services generally shall be performed at such times and at such places as selected by Consultant.

2.2   In connection with the Services, Consultant represents and covenants to the Company as follows: (a) Consultant will comply at all times with all applicable laws and regulations of any jurisdiction in which Consultant performs work on behalf of Company; (b) Consultant shall carry out the Services in a manner consistent with the ethical and professional standards of Company; (c) Consultant and its agents will comply at all times with all security provisions in effect from time to time on Company's premises, with respect to access to premises, and all materials belonging to Company; (d) Consultant will not use Company's name in any promotional materials or other communications with third parties without Company's prior written consent; and (e) Consultant is legally authorized to engage in business in the United States, now and at all times, during the term of this Agreement.

3.0   Compensation for Services; Independent Contractor Status.

3.1   In consideration of Consultant's Services under this Agreement and Consultant's covenants set forth herein, Consultant will be paid the remuneration set forth in Exhibit A

("Compensation"). Company shall have no obligation to provide any payments, or benefits to or on behalf of Consultant other than the Compensation.

3.2  In the event Consultant is required to incur certain expenses, such as automobile, airfare, and related transportation expenses as part of its duties herein, Consultant shall be entitled to reimbursement of such expenses if Consultant obtains Company's prior written consent (including email from an authorized officer of the Company). Consultant shall have no authority to, and shall not, incur any expense for or on behalf of Company without Company's prior written consent (including email from an authorized officer of the Company).

3.3  Consultant shall, with respect to this Agreement, be an independent contractor, and shall not be an agent or employee of Company for any purpose whatsoever. Consultant acknowledges that neither it nor any of its Affiliates is authorized to enter into any contract or assume any obligation on behalf of Company without the prior written consent of Company. Consultant has the authority to control and direct the performance of the details of the Services, as governed by Consultant's own independent judgment and discretion and provided that such performance complies with Consultant's obligations under this Agreement.

3.4  As an independent contractor, neither Consultant nor any of its employees (nor, for the avoidance of doubt, Key Individual) will be entitled to participate in health other employee benefit plans of Company or entitled to workers' compensation insurance benefits from Company, except as specifically provided in this Agreement. Consultant shall be solely responsible for (i) the payment of all compensation, in compliance with all applicable laws, to all employees engaged by Consultant to provide the Services; (ii) the withholding of any and all of its required contributions and/or taxes and the payment of all such withheld amounts to the appropriate agencies or authorities including, without limitation, federal, state and local income taxes and withholdings, workers' compensation insurance, disability insurance, unemployment contribution insurance and Social Security taxes; and (iii) providing any employees engaged by Consultant with all benefits as required by law or otherwise attendant to their employment by Consultant. Consultant represents and warrants that it is complying and will continue to comply with all federal, state and local requirements regarding the foregoing and will indemnify and hold Company and its parents, subsidiaries and affiliates harmless from any action by any individual or governmental entity arising out of Consultant's failure to properly and timely perform any such responsibilities.

4.0  Assignment of Rights and Inventions. In consideration of this Agreement and the Compensation Consultant shall receive for the Services, Consultant Parties and Company agree as follows:

4.1  Consultant shall disclose promptly to Company any and all Work Product which it may conceive, make, develop, invent, enhance, create or work on, in whole or in part, during the Term, solely or jointly with others, that is related to or reasonably within the scope of the Services.

4.2  All matters subject to disclosure under Section 4.1, together with all related rights whether registered or unregistered (such as patents, copyrights, trademarks, designs, and trade secrets), shall belong exclusively to Company.

4.3  Consultant Parties hereby acknowledge and agree that any Work Product that was made by a Consultant Party (solely or jointly with others) within the scope of the Consultant's engagement by Company is a "work made for hire" that is owned exclusively by Company pursuant to United States Copyright Act (17 U.S.C., Section 101).

4.4  To the extent that any such Work Product is deemed not to be a "work made for hire" or that other intellectual property rights are embodied therein, each Consultant Party hereby assigns, and

27408747.3                                            2

agrees to assign, to Company all right, title and interest in and to any such Work Product and all intellectual property rights therein, as well as to all other intellectual property contributed to or conceived or made by such Consultant Party at any time during the Consultant's engagement with Company (in each case, whether alone or jointly with others) to the fullest extent permitted under applicable law. Each Consultant Party shall cooperate with Company to protect Company's interests in such intellectual property including, without limitation, providing assistance in securing patent protection and trademark and copyright registrations and signing all documents reasonably requested by Company, even if such request occurs after termination of Consultant's engagement by Company. Company agrees to pay Consultant for all reasonable out of pocket expenses incurred by Consultant in providing assistance pursuant to this Section 4.

4.5     Each Consultant Party represents and warrants that: (i) the Work Product will be original, developed by independent invention of such Consultant Party and will not infringe upon any third party trade secret; (ii) no information used in the development of the Work Product was received, learned or otherwise acquired in breach of any of such Consultant Party's confidentiality or non-disclosure obligations; and (iii) the Work Product will be exclusively developed for and provided to Company under this Agreement.

5.0     Confidential Information.

5.1     Each Consultant Party acknowledges and agrees that Consultant's Services to Company hereunder require the use of confidential information of Company including, without limitation, methods, techniques, processes, know-how, customers, customer lists, markets and other trade secrets that Company has made reasonable efforts to keep confidential and that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Each Consultant Party further acknowledges and agrees that any documents or other materials of any nature relating directly or indirectly to such confidential information, trade secrets, confidential business or technical information (whether or not written and whether or not marked confidential), know-how not generally known to the public, or Work Product which come into Consultant's possession or are acquired, learned, or produced by Consultant in connection with Services provided under this Agreement are confidential, and shall remain, the exclusive property of Company; provided, however, that Company confidential information shall not be deemed to include information of Company that is or becomes publicly known, other than as a result of a Consultant Party's breach of this Agreement. Each Consultant Party agrees to retain all Company confidential information and materials in strict confidence, and each Consultant Party acknowledges that it has a duty of confidence owed to Company with respect to all Company confidential information. Neither Consultant Party shall use any Company confidential information or materials for its own benefit or the benefit of any third party and agrees to deliver or return all Company confidential information, documents, and other materials, and all copies, memoranda, notes or extracts thereof, to Company at any time upon the Company's request and upon the termination or expiration of this Agreement, unless specific written consent to use such Company confidential information or retain Company documents, other materials or Work Product is obtained from a duly authorized representative of Company. In the event a Consultant Party is required by law, regulation, or legal process to disclose any of Company's confidential information, such Consultant Party agrees to (a) give Company, to the extent possible, advance notice prior to disclosure so Company may contest the disclosure or seek a protective order, and (b) limit the disclosure to the minimum amount that is legally required to be disclosed.

5.2     Notwithstanding any other provision of this Agreement, the Company advises Consultant of the following: Under the Defend Trade Secrets Act of 2016, Consultant shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is (a) made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

6.0   No Competing Obligation and Indemnity.

6.1   Each Consultant Party represents and warrants that it is not presently a party to, nor will it enter into, any agreement which will or could reasonably be expected to prevent such Consultant Party from fulfilling its obligations under this Agreement.

6.2   Each Consultant Party represents and warrants that such Consultant Party shall not use any third party confidential or proprietary information or material of any kind in any Work Product it develops for Company.

6.3   Each Consultant Party represents and warrants that (i) the execution, delivery and performance of this Agreement does not and shall not conflict with, or result in the breach of or violation of, any other agreement, instrument, order, judgment or decree to which such Consultant Party is a party or by which such Consultant Party is bound, and (ii) upon the execution and delivery of this Agreement by Company, this Agreement shall be the valid and binding obligation of such Consultant Party, enforceable in accordance with its terms.

6.4   Each Consultant Party shall indemnify and hold Company and each of its affiliates, directors, officers, employees and customers (collectively, the "Indemnified Parties," and each, an "Indemnified Party") harmless from any and all liabilities, deficiencies, costs and other expenses (including, but not limited to, damages, attorney fees, and court costs) incurred by any of the Indemnified Parties as a result of any claim, action, suit, investigation, audit, demand, assessment, fine, judgment or proceeding made or brought against any of the Indemnified Parties based upon (i) any allegation of facts that if they were true would mean that such Consultant Party violated the representations and warranties or covenants contained in this Agreement, (ii) any reckless or intentionally wrongful act of a Consultant Party or Consultant's assistants, employees or agents in performing the Services, and (iii) a determination by a court or agency that Consultant (or any of its assistants, employees or agents) is not an independent contractor.

7.0   Non-Competition Agreement.

7.1   Consultant Parties agree that for three years from the date hereof (the "Non-Competition Period"), Consultant Parties will not (other than on behalf of the Company in accordance with this Agreement), directly or indirectly, either for themselves or for any other person, partnership, corporation or company, (1) permit their respective names to be used by or participate in any business or enterprise that sells, markets or distributes any products similar to those that are part of the Purchased Assets or the Business or in any manner competitive with the Business, in each case, anywhere within the United States of America or elsewhere in any geographical territory in which the Sellers did business or into which the Sellers sold products for the 24-month period immediately prior to the Closing Date , (2) induce or attempt to induce any contractor or employee of Company or its Affiliates to leave its employ or stop performing services or in any way interfere with the relationship between Company and its Affiliates and their respective employees or contractors, (3) solicit or hire any person who was an employee or contractor of Company or its Affiliates at any time during the Non-Competition Period, and (4) induce or attempt to induce any supplier, licensee, licensor, franchisee or other business relation of Company or its Affiliates to cease doing business with them or in any way interfere with the relationship between Company or any of its Affiliates and any such person or business relation (including, without limitation, making any negative statements or communications about Company or its Affiliates).  For purposes of this Agreement, the term "participate" includes any direct or indirect interest in any enterprise, whether as an officer, director, employee, partner, sole proprietor, stockholder, agent, representative, independent contractor, consultant, franchisor, franchisee, creditor, investor, lender, owner or otherwise; *provided that* the term "participate" shall not include ownership of less than 2% of the stock of a publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market. Consultant Parties acknowledge that

the restrictions set forth above are reasonable and necessary with respect to duration, geography and scope to protect the goodwill of the business of the Company.

7.2     The Consultant Parties agree that Company would suffer irreparable harm from a breach by any of the Consultant Parties of any of the covenants or agreements contained in this Section 7 and that money damages would not be an adequate remedy for any such breach. In the event of a breach or threatened breach by any of the Consultant Parties of any of the provisions of this Section 7, Company or its successors or assigns, in addition to all other rights and remedies existing in its favor, shall be entitled to specific performance and/or injunctive or other equitable relief from any court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (including, without limitation, the extension of the Non-Competition Period by a period equal to the length of the violation of this Section 7), without posting any bond or other security. In the event of an alleged breach or violation by any of the Consultant Parties of any of the provisions of this Section 7, the Non-Competition Period described above shall be tolled until such alleged breach or violation has been duly cured. Consultant Parties agree that these restrictions are reasonable. If, at the time of enforcement of any of the provisions of this Section 7, a court holds that the restrictions stated therein are unreasonable under the circumstances then existing, the Parties agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Consultant Parties agree that the covenants made in Section 7 shall be construed as an agreement independent of any other provision of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision of this Agreement.

8.0     Term and Termination.

8.1     The term of this Agreement starts on May 1, 2018 and ends on December 24, 2018, subject to earlier termination under Section 8.2 below (the "Term").

8.2     This Agreement may be terminated: (i) by Company, upon any Consultant Party's failure to cure (if capable of being cured) its (a) refusal or failure to perform in compliance with this Agreement or (b) breach of any of the representations and warranties or covenants of any Consultant Party contained in this Agreement; or (ii) automatically upon the death or Disability of Berenika Maciejewicz. In the event of termination under (i) above, Consultant shall continue to provide Services pursuant to this Agreement until the actual termination date if so requested by Company, and in the event of termination for any reason prior to December 24, 2018, Company shall pay Consultant for the Services provided by Consultant that are rendered prior to the actual termination date on a pro rata basis, as set forth on Exhibit A. This payment shall be Company's only obligation to Consultant in the event of such termination (for any reason or no reason). "Disability," for the purposes of this Section 8.2 shall mean an inability by either Berenika Maciejewicz to perform the essential functions of Consultant's duties under this Agreement for a period of more than 30 days by reason of a physical or mental injury, infirmity or incapacity, as determined by Company in its sole discretion.

8.3     Personal Services Agreement. Consultant acknowledges and agrees that this Agreement is a personal services agreement under which Company has requested and Consultant has agreed to provide the personal services of Berneika Maciejewicz for up to 20 hours per month, based on the needs of the Company. It is hereby acknowledged that this individual shall be personally available and responsible for purposes of fulfilling the duties of Consultant under this Agreement and may not subcontract the essential duties of Consultant to another individual. However, Consultant shall have the right to engage others to assist in the accomplishment of the Services. Consultant shall be solely responsible for paying all compensation owed to any assistants, and for applicable taxes.

9.0     General.

      9.1      Consultant's employees, if any, who perform services for Company under this Agreement shall also be bound by the provisions of this Agreement. To that end, Consultant agrees to take necessary steps to have Consultant's employees execute documents ensuring that they are bound by the provisions of this Agreement.

      9.2      Sections 8.1 (Amendment and Waiver), 8.2 (Notices), 8.4 (Severability), 8.6 (Counterparts), 8.7 (Governing Law), 8.8 (Waiver of Jury Trial), and 8.13 (Interpretation) of the Purchase Agreement are incorporated herein, *mutatis mutandis*, with references to "Buyer" being replaced by "Company" and references to "Sellers" being replaced by "Consultant Parties."

      9.3      Consultant Parties shall not assign any rights, or delegate or subcontract any obligations, under this Agreement without the prior written consent of Company. Any assignment in violation of the foregoing shall be deemed null and void. The Company may freely assign its rights and obligations under this Agreement at any time. Subject to the limits on assignment stated above, this Agreement shall be binding on the successors, legal representatives and assigns of the Parties.

      9.4      The expiration or termination of this Agreement shall not affect the provisions of this Agreement dealing with the assignment of rights to Company, such Consultant Party's obligation to assist Company in perfecting its rights, nor such Consultant Party's warranties, indemnities, or obligation of confidentiality, non-competition or other restrictive covenants.

      9.5      This Agreement and the Purchase Agreement constitute the final, complete and entire agreement between the Parties and it supersedes any and all prior or contemporaneous agreements, communications or representations between the Parties, either oral or in writing, relating to the subject matter of this Agreement.

The Parties hereto have executed this Consulting Agreement as of the Effective Date.

**COMPANY:**

SEABRELLA LLC, a Florida limited liability company

By: _____

Its: _____President_____

Address:   704 West Bay Street
Tampa, FL 33606
Fax: 435-655-6080

**CONSULTANT:**

Flamaggio LLC, a Wyoming limited liability company

_____
Berenika Maciejewicz, Manager

FEIN: _81-1362275_

Address: _412 N MAIN ST. STE 100, BUFFALO, NY 82834_

**KEY INDIVIDUAL:**

_____
Berenika Maciejewicz

Address: _412 N MAIN ST, STE 100, BUFFALO, NY 82834_

27408747.3

7

GD

## EXHIBIT A

## SERVICES AND COMPENSATION

**SERVICES**

The services ("Services") to be provided by Consultant will include the following:

(a) Provide input, advice and assistance to Seabrella LLC in the general management of the ZenZoi product line and business, including, without limitation, sourcing, purchasing, new product development and launches, sales, marketing, fulfillment, relationship with suppliers and customers (including Amazon.com), and all similar issues (the "Business").

(b) General consulting advice and input regarding all aspects of the operation of the Business as well as assistance and training to Company, affiliates and their employees and consultants including, without limitation, advice and input on merchandising, retail strategy, marketing, computer software, sales techniques and internet strategies as well as customer specific strategies regarding Amazon.com, Jet.com, Walmart.com and other Internet websites.

(c) Provide input, advice and assistance on promotions and marketing of the Business.

(d) Training on any of the foregoing sufficient so that Company and its personnel can learn how to continue on with the Business without Consultant's ongoing input following the Term.

(e) Such other services as may from time to time be requested by Company that are reasonably related to the Business.

(f) Consultant shall provide up to 20 hours per month of time and attention from Berenika Maciejewicz in providing the foregoing Services.

**COMPENSATION**

The Consultant shall be paid the following amounts:

(a) A Commission shall be paid the consultant for services from May 1, 2018 through December 24, 2018 as described below, plus

(b) Reimbursement of certain pre-approved, in the Company's sole discretion, expenses.

(c) Consultant shall submit an invoice for expenses monthly as a prerequisite for any reimbursement.

(d) Consultant will submit all work and invoices to individual(s) designated by Company.

(e) Company shall pay such invoices within 10 days of receipt.

**COMMISSION**

Subject to Consultant's compliance with all the terms and conditions of this Agreement, Company shall pay Consultant a commission (the "Commission") during the Term of this agreement, as follows:

(a) The Commission to be paid to the Consultant will be equal to 50% of the EBITDA of Seabrella LLC from May 1, 2018 through December 24, 2018 (or such earlier date, if the Consultant is terminated prior to December 24, 2018).

(b) The Company will pay the Consultant $10,000 per month, starting on June 1, 2018, as a prepayment toward the Commission to be paid to Consultant from May 1, 2018 through December 24, 2018 (or such earlier date, if the Consultant is terminated prior to December 24, 2018).

(c) A final Commission payment will be calculated and paid to Consultant on December 28, 2018 and the monthly prepayments of $10,000 to Consultant will be deducted
   a. The final Commission will not be paid to Consultant if the annualized sales of the Company (from January 1, 2018 through December 24, 2018 (or such earlier date, if the Consultant is terminated prior to December 24, 2018)) do not exceed a run rate of $2,780,000, calculated in accordance with the methodologies set forth on Exhibit C attached hereto.
   b. Annualized sales will be based on a 365 day year.

(d) EBITDA" means earnings before interest, taxes, depreciation and amortization; provided, that the parties agree that in determining EBITDA:

   a. the "Cost of Goods Sold" shall be determined as follows:
      i. the cost of goods sold for inventory will be determined by the moving average unit cost "MAUC"
      ii. The cost of goods sold will be based on a first in first out methodology "FIFO".
   b. In all cases, EBITDA would be determined based on GAAP accounting subject to mutually agreed upon allocated costs.
   c. An illustrative example of the methodologies used by the Sellers for calculating EBITDA is set forth on Exhibit C attached hereto and the same methodology will continue to be used for purposes of calculating the EBITDA under this Agreement.

(e) By way of example, a "Sample Commission Calculation" is attached hereto as Exhibit B. The parties agree that this Sample Commission Calculation contemplates the Consultant providing services until December 24, 2018 and that the actual Commission would be adjusted accordingly if Consultant is terminated prior to December 24, 2018.

(f) Consultant and Company will work together to identify new Company products that could be launched under the Business and such new products shall be included within the calculation of relevant sales.

(g) All products will be required to meet Company's quality and testing standards and other policies.

(h) Subject to the other terms and conditions of this Agreement, the obligation to pay the Commission shall only apply to sales of each product of the Business made during the Term of this agreement.

(i) For purposes of this Agreement, a "sale" shall be deemed to have been made if the product has been ordered by a customer and shipped and invoiced.

(j) Together with the payment of the Commission, Company shall render to Consultant a written statement disclosing the Commission calculation.

(k) The statement shall set forth and itemize the total EBITDA from May 1, 2018 through December 24, 2018 (or such earlier date, if the Consultant is terminated prior to December 24, 2018).

(l) In order that the Commission hereunder may be determined, and verified, the Company agrees: to keep complete and accurate books and records showing the EBITA on which the Commission was calculated; and to permit Consultant, or its authorized representative, at Consultant's expense,

within 10 business days' advance written notice, and no more than three months after the expiration of the Term, to inspect and examine the books and records relating to the Commission, insofar as it is deemed reasonably necessary by Consultant to determine the Commission due hereunder.

27408747.3     10

## EXHIBIT B

## SAMPLE COMMISSION CALCULATION

| | |
|---|---|
| Minimum Annualized Gross Sales from Jan 1- Dec 31, 2018 | $2,780,000 |
| EBITDA from May 1, - Dec 24, 2018 | $ 400,000 |
| 50% Commission payable to Consultant | $ 200,000 |

(a) Annualized Gross Sales are calculated by taking actual Gross Sales from Jan 1, 2018 through Dec 24, 2018 and then dividing by 358 days and multiplying by 365 days. If Annualized Gross Sales as calculated do not reach $2,780,000 then no final Commission will be paid to Consultant

(b) Assuming the Company from May1, 2018 through December 24, 2018 generates $400,000 in EBITDA then a $50% Commission will be paid or $200,000.

## EXHIBIT C

See attached.

**EXHIBIT C**
Consulting Agreement

Zenzoi
Trended Income Statements (US - Dollars) - 2017 / 2018 YTD & Forecast

| | 2017 | | | | YTD - Q1 - 2018 | | | Q2 - 2018 | | | Q3 - 2018 | | | Q4 - 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US | INT | TL | % | US | INT | TL | US | INT | TL | US | INT | TL | US | INT |
| **Gross Sales** | | | | | | | | | | | | | | | |
| Other Channel (Ebay/Walmart/Shopify) | 75,482 | - | 75,482 | | 17,730 | | 17,730 | | | | | | | | |
| Product sales FBA | 1,909,846 | 1,169,719 | 3,079,565 | | 378,220 | 254,305 | 632,525 | 425,000 | 300,000 | 725,000 | 400,000 | 230,000 | 630,000 | 375,000 | 375,000 |
| Amazon Shipping - Freight Revenue | 69,799 | 24,325 | 94,125 | | 8,671 | 8,387 | 17,058 | | | | | | | | |
| Sales TAX & VAT | | | | | | | | | | | | | | | |
| | 2,055,128 | 1,194,044 | 3,249,171 | 146% | 404,621 | 262,692 | 667,313 | 425,000 | 300,000 | 725,000 | 400,000 | 230,000 | 630,000 | 375,000 | 375,000 |
| **Discounts, Returns & Allowances** | | | | | | | | | | | | | | | |
| *Promo Rebates* | 509,825 | 410,384 | 920,209 | | 129,214 | 37,964 | 167,178 | | | | | | | | |
| *Promo Rebates - Refund* | (17,341) | (14,899) | (32,240) | 0.00% | (4,323) | (4,007) | (8,330) | | | | | | | | |
| Promo Rebates | 492,484 | 395,485 | 887,969 | -40% | 124,891 | 33,957 | 158,848 | | | | | | | | |
| Product Returns | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | |
| *Amazon Refunds* | 77,131 | 61,932 | 139,063 | 4% | 18,356 | 20,330 | 38,685 | | | | | | | | |
| *Walmart Refunds* | | | | | | | | | | | | | | | |
| *Ebay Refunds* | | | | | | | | | | | | | | | |
| *Shopify Refunds* | | | | | $ | | | | | | | | | | |
| Refunds | 77,131 | 61,932 | 139,063 | 4% | 18,361 | 20,330 | 38,685 | | | | | | | | |
| Reserve For Product Returns | | | | | | | | | | | | | | | |
| | 569,615 | 457,417 | 1,027,032 | | 143,251 | 54,286 | 197,533 | | | | | | | | |
| | 72% | 62% | 68% | | 65% | 79% | 70% | | | | | | | | |
| **Net Sales** | 1,485,513 | 736,626 | 2,222,139 | 100% | 261,370 | 208,406 | 469,780 | | | | | | | | |
| **Cost of Sales** | 14% | 11% | 13% | | 15% | 10% | 13% | | | | | | | | |
| Cost of Goods Amazon | 203,316 | 80,250 | 283,566 | | 39,257 | 19,871 | 59,129 | | | | | | | | |
| Cost of Goods Other Channels | | | | | 1,738 | | 1,738 | | | | | | | | |
| Inventory Write Up Per Purchase Accounting | | | | | | | | | | | | | | | |
| | 203,316 | 80,250 | 283,566 | 15% | 40,996 | 19,871 | 60,867 | | | | | | | | |
| | 86% | 89% | 87% | | 84% | 90% | 87% | | | | | | | | |
| **Gross Profit** | 1,282,197 | 656,376 | 1,938,573 | 87% | 220,374 | 188,534 | 408,914 | | | | | | | | |
| | | | 1,947,909 | | | | | | | | | | | | |
| **Selling, General & Administrative Expenses** | | | | | | | | | | | | | | | |
| *Seller Fulfillment Fees* | 6 | - | 6 | | 135 | 6 | 142 | | | | | | | | |
| *FBA selling Fees* | 220,425 | 115,864 | 336,289 | | 40,121 | 32,289 | 72,410 | | | | | | | | |
| *Selling fee refund* | (8,582) | (6,871) | (15,453) | | (2,119) | (2,352) | (4,472) | | | | | | | | |
| Amazon Fulfillment Fees | 211,849 | 108,993 | 320,842 | 17% | 38,137 | 29,943 | 68,080 | | | | | | | | |
| *FBA Transaction Fees* | 310,757 | 92,792 | 403,549 | | 64,949 | 25,429 | 90,378 | | | | | | | | |
| *FBA Transaction Fees Refund* | (759) | (355) | (1,114) | | (179) | (118) | (297) | | | | | | | | |
| Amazon Transaction Fees | 309,997 | 92,438 | 402,435 | 21% | 64,770 | 25,311 | 90,081 | | | | | | | | |
| *Amazon Referral Fees/Sponsord Ads* | 165,995 | 142,861 | 308,857 | | 31,078 | 69,102 | 100,180 | | | | | | | | |
| *Advertiser Refund* | (11) | - | (11) | | - | - | - | | | | | | | | |
| Amazon Referral Fees/Sponsord Ads | 165,984 | 142,861 | 308,846 | | 31,078 | 69,102 | 100,180 | | | | | | | | |
| *Service Fee* | 66,467 | 22,416 | 88,883 | | 7,112 | 7,937 | 15,049 | | | | | | | | |
| *Refund Administration Fee* | 1,686 | 1,364 | 3,050 | | 424 | 465 | 889 | | | | | | | | |
| Amazon Service Fees & Other Channels | 68,153 | 23,780 | 91,934 | 5% | 7,536 | 8,402 | 15,938 | | | | | | | | |
| Amazon Inventory & Inbound Service Fees | 29,183 | 760 | 29,942 | 2% | 16,296 | 555 | 16,851 | | | | | | | | |
| Amazon Adjustments | 2,598 | 185 | 2,783 | | 809 | - | 809 | | | | | | | | |
| *Walmart Fees* | | | | | 404 | | 404 | | | | | | | | |
| *Walmart Sponsord Fees* | | | | | | | | | | | | | | | |
| Walmart Fees & Sponsord Ads | | | | | 404 | - | 404 | | | | | | | | |
| *Ebay Fees* | | | | | 311 | | 311 | | | | | | | | |
| *Ebay Sponsord Fees* | | | | | | | | | | | | | | | |
| Ebay Fees | | | | | 311 | - | 311 | | | | | | | | |
| *Shopify Fees* | | | | | 396 | | 396 | | | | | | | | |
| *Shopify Sponsord Fees* | | | | | | | | | | | | | | | |
| Shopify Fees | | | | | 396 | - | 396 | | | | | | | | |
| Total Seller Portals Fees & Marketing | 787,764 | 369,017 | 1,156,782 | 52% | 159,737 | 133,314 | 293,050 | | | | | | | | |
| *Other Channel Shipping Fees* | | | | | 1,619 | | 1,619 | | | | | | | | |
| *Credit Card Transaction Fees* | | | | | 470 | | 470 | | | | | | | | |
| *Bank Charges & Merchant Fees* | 405 | 405 | 810 | | 113 | 113 | 225 | | | | | | | | |
| *Dues & Subscriptions* | 300 | 300 | 600 | | 75 | 75 | 150 | | | | | | | | |
| *Domains* | 60 | 60 | 120 | | 15 | 15 | 30 | | | | | | | | |
| *Other Expenses of Zenzoi* | | | | | | | | | | | | | | | |
| Other Administrative Expenses | | | | | 2,291 | 203 | 2,494 | | | | | | | | |
| | 788,529 | 369,782 | 1,158,312 | 52% | 162,028 | 133,516.1 | 295,543.9 | | | | | | | | |
| **EBITA** | 493,667 | 286,594 | 780,261 | | 58,346 | 55,018 | 113,370 | | | | | | | | |
| Depreciation | | | | | | | | | | | | | | | |
| **EBITDA (Net Income)** | 493,667 | 286,594 | 780,261 | 35% | 58,346 | 55,018 | 113,370 | | 145,000 | | | 107,100 | | | |

Estimate ( Estimated Operating Expenses of $40,000 not included)